Filed 1/3/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHELLE GUIFFREDA,<br><br>    Defendant and Appellant. | D079834<br><br><br>(Super. Ct. No. SCD172677) |

APPEAL from a judgment of the Superior Court of San Diego County, Albert T. Harutunian, III, Judge.  Reversed and remanded.

Donna L. Harris, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

Michelle Lynn Guiffreda appeals from an order denying her petition for resentencing on a 2004 conviction for second-degree murder under Penal

Code section 1170.95 (now section 1172.6).[1]  After an evidentiary hearing, the trial court found there was insufficient evidence of malice aforethought to establish Guiffreda's liability as a direct aider and abettor to murder. However, the court denied her petition based on a felony murder theory after finding beyond a reasonable doubt under current law that:  (1) Guiffreda was a major participant in the underlying robbery which led to the victim's death; and (2) she acted with reckless indifference to human life.  (§ 189, subd. (e)(3).)

Guiffreda contends on appeal that the record does not support the trial court's major participant and reckless indifference findings.  Viewing the evidence in the light most favorable to the trial court's ruling, we conclude that there is insufficient evidence to support its finding that Guiffreda acted with reckless indifference to human life.  Accordingly, we need not resolve whether she was a major participant.  We reverse and remand the matter to the trial court with directions to vacate her murder conviction and conduct further proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

A. *M.B.'s Killing*

According to preliminary hearing testimony, in the early afternoon on January 29, 2003, 19-year-old Guiffreda and codefendants Matthew Peace and Eric Oie, Guiffreda's husband, were at a motel where they had stayed the previous night.  When they could not pay the $45 rate for an additional night,

---

[1]  Guiffreda brought her petition under former section 1170.95, which was amended effective January 1, 2022, and then renumbered as section 1172.6 without substantive change on June 30, 2022.  (See Stats. 2022, ch. 58, § 10, (Assem. Bill No. 200).)  We refer to the subject statute by its current number throughout this opinion.  Further statutory references are to the Penal Code unless otherwise stated.

the motel manager evicted them from their room around 2:15 p.m. and took their room key. Guiffreda, Oie, and Peace took their belongings outside and sat down next to a soda machine.

Meanwhile, M.B. checked in to room 103 at around 1:30 p.m. There is no evidence of any prior relationship or acquaintance between M.B. and Guiffreda, Oie, or Peace. Another motel resident observed that M.B. had a thick bank envelope protruding from his back pocket, and the envelope was still visible when M.B. was later seen talking with Guiffreda in front of the soda machine with Oie and Peace nearby. After their conversation, Guiffreda went with M.B. into his room, leaving the door ajar. At that time, Oie and Peace got up and walked over to a truck parked in the motel parking lot. They placed their bags in the back of the truck, got inside the truck's cabin briefly, and then went into room 103 (M.B.'s room), closing the door behind them.

At the preliminary hearing, the truck's owner testified that he thought he had locked the truck's doors after parking it at the motel. But after the police arrived, he noticed that the doors were unlocked. The truck's owner also kept a heavy flashlight inside the vehicle. After retrieving the truck from impound, he noticed the flashlight was missing. He did not give anyone permission to use or access his truck while it was parked at the motel.

Sometime after Oie and Peace entered room 103, a couple in the neighboring room heard a door open and saw Guiffreda hurry past their window towards the street. Oie and Peace then exited room 103 and walked over to the truck to retrieve their bags. One of them accessed the truck's cabin again briefly, then they walked away in the direction Guiffreda went.

About ten minutes later, another motel resident asked the couple in the neighboring room to check on room 103 because he was concerned something

was "going on" in there.  No one answered when they knocked on the locked door, and the couple noticed that the window next to the door was open.  After one of the motel residents took the screen off the window and pulled the curtain aside, they saw M.B. fully dressed and lying on the bed, which was still made.  He was moving at the time and trying to speak.

The motel manager arrived at the room soon after, around 2:35 p.m., and went inside.  He called 911 to report that M.B. was unconscious and bleeding heavily from his head.  The operator instructed the manager to put a towel over M.B.'s face, and as he did so, the manager noticed M.B. was still breathing.

Eventually paramedics arrived to transport the victim to a nearby hospital, where he later died.  One of the responding paramedics told law enforcement that no wallet or keys were found in the room, and there were no visible papers.  The room was also well-kept, it did not look like a struggle had occurred, and no weapon was found inside.

After police officers secured the crime scene, a homicide detective collected a white bank envelope from the room's floor that had Guiffreda's and Peace's fingerprints on it.  Officers also inspected the truck that witnesses had seen Oie and Peace access that day, and they found what was presumed to be blood on the gearshift.  When detectives interviewed witnesses after the incident, one witness who was at the motel told detectives that he saw Oie physically abusing Guiffreda and grabbing her by the hair.

A medical examiner conducted an autopsy and concluded that M.B.'s cause of death was "multiple blunt-force head injury."  M.B. had five scalp lacerations and bruises on his hands, head, and shoulders.  The medical examiner noted that the bruises on his hands may have been defensive

4

wounds. M.B.'s skull had several fractures, and his brain was swollen and bruised.

The night of the incident, the defendants paid for a room at the Westin Hotel at Horton Plaza in San Diego, spending around $500 in cash. A couple of weeks later, on February 14, 2003, Guiffreda, Peace, and Oie were arrested in Rosarito, Mexico, after someone reported them to Mexican authorities.

B. *Conditional Examination of Gerardo Mancillas*

In May 2004, the People conducted a conditional examination of Gerardo Mancillas, who testified about his encounters with the defendants in Mexico after M.B.'s death. On the night of February 1, 2003, a few days after the incident, Mancillas was working in reception at a hotel in Rosarito, Mexico. A security guard told Mancillas that he suspected some guests were selling drugs in one of the hotel rooms, so Mancillas called the police. After hotel security guards knocked on the room's door, Oie and Peace attempted to run away, but police officers arrived and arrested them. The police did not arrest Guiffreda and left her at the hotel, but Mancillas's manager did not want her staying there, so Mancillas let her stay in a room for employees. Mancillas said that he wanted to help Guiffreda because she was crying and seemed afraid.

When Mancillas checked on Guiffreda the following morning at the end of his shift, Guiffreda asked for information about Oie and Peace. She also told him that they could not go back to the United States because they had done something "very serious, something wrong." Mancillas moved Guiffreda to another hotel, where he knew the owners, and at that point Guiffreda told Mancillas that they had murdered someone. Guiffreda said that she, Oie, and Peace planned for her to get a man into a hotel room "to have sex," and then Oie and Peace were going to come in, assault him, and take his money.

5

If the police arrived, the plan was to tell them that the man was raping or kidnapping Guiffreda. According to Mancillas, Guiffreda said Oie beat the victim with a baseball bat while Peace hit and kicked him. Guiffreda also told Mancillas that "they don't want to be -- to be too much, you know, to hit too much, and they hit a lot and the guy is -- is in the floor, bleeding."

After Mancillas located the jail where Oie and Peace were being held, Guiffreda gave him money for bail. Mancillas posted their bail and they went back to the hotel where Guiffreda was staying. Guiffreda then recounted the events leading up to the killing again, and when Oie and Peace seemed nervous that she was talking about it, she assured them that Mancillas already knew what happened. According to Mancillas, Oie and Peace did not contradict Guiffreda's narrative. Mancillas and the defendants parted ways a couple of days later.

About a week afterwards, Mancillas saw in the local paper that the defendants had been arrested. He said that in total, he received about $800 in cash from the defendants during their interactions to cover expenses like gas, food, lodging, and bail.

C. *Guiffreda's Statements to Probation*

In September 2004, Guiffreda pled guilty to second-degree murder (§ 187, subd. (a); count 1) and the People agreed to dismiss the remaining robbery charge. The parties stipulated to using the preliminary hearing transcript as the factual basis for the plea. Around that time, Oie pled guilty to first-degree murder and Peace pled guilty to second-degree murder.

In her interview with probation before sentencing, Guiffreda denied that the incident was pre-planned and denied taking the victim's money. She said that she entered M.B.'s room and asked him if she could borrow money to pay for her room at the hotel. He propositioned her and she refused, but

6

she believed she could still use her charm to get money from him. Guiffreda told the probation officer that after Oie and Peace followed her into the room, Peace began punching M.B. Oie then threatened M.B. and demanded money from him, but when he refused to comply, Oie struck him with a metal pipe. Guiffreda said she yelled for Oie to stop, but he continued to beat the victim. Afterwards, the defendants took the cash from the bank envelope and made their way to Mexico, where they spent the money on hotels, clothes, and food. Guiffreda said she did not understand why Oie hit the victim so hard because it was unnecessary to do so.

D. *Guiffreda's Petition for Resentencing*

In October 2004, the court sentenced Guiffreda to an indeterminate term of 15 years to life. In 2019, Guiffreda filed a petition for resentencing under amended section 1172.6. After appointing counsel, finding that Guiffreda had established a prima facie case of entitlement to relief, and issuing an order to show cause, the trial court held an evidentiary hearing in September 2021 to determine whether Guiffreda was entitled to relief.

At the hearing, the court and the parties relied on the preliminary hearing transcript, Mancillas's conditional examination transcript, Guiffreda's change of plea form, and Guiffreda's probation report. After hearing the parties' arguments, the trial court issued a written opinion and order finding there was insufficient evidence of malice aforethought to establish Guiffreda's liability as a direct aider and abettor to murder. However, the court denied her petition on a felony murder theory after finding beyond a reasonable doubt under current law that: (1) Guiffreda was a major participant in the underlying robbery which led to M.B.'s death; and (2) she acted with reckless indifference to human life.

The court found that Guiffreda was a major participant in the underlying robbery because "[t]he plan centered around her luring the victim into his room, leading him to believe she would have sex with him, getting his guard down, making sure the co-defendants could enter the room, and then pretending she was being raped to justify the assault by the co-defendants." The court noted that Guiffreda's fingerprints were on the bank envelope and that she fled the scene with her codefendants, using the stolen money to escape apprehension.

The court also found that Guiffreda acted with reckless indifference to human life because the context of the planned assault, which was a scenario involving "an outraged husband finding his wife being raped[,] . . . carries with it an inherent extreme likelihood of an intent to administer a severe beating, not just a battery to achieve compliance in case of victim resistance." The court reasoned that "[t]here was no need to manufacture a situation justifying extreme violence if [the defendants'] intention had been to use only the force necessary to dispel any resistance by the victim." The court noted that Guiffreda's statements to Mancillas that they had murdered someone, and the fact that she did not seem to distance herself from the incident or absolve herself of responsibility, reflected her consciousness of guilt.

The court further found that Guiffreda exhibited reckless indifference to the victim's life because she "was personally present and stood by as her co-defendants severely beat the victim in the head with a bat or similar instrument." The court acknowledged in a footnote that "[t]here is no direct evidence that she believed they had obtained a flashlight to use as a weapon." However, the court found it significant that she did not attempt to intervene in the beating or render aid afterwards, and the court found her probation interview statements—about telling Oie to stop beating the victim—lacking

8

in credibility.  Accordingly, the trial court denied Guiffreda's petition for resentencing.

Guiffreda timely appealed the order.

DISCUSSION

Guiffreda contends on appeal that the record does not support the trial court's findings that she was a major participant in the underlying robbery and that she acted with reckless indifference to human life.  We agree that there is insufficient evidence to support the court's finding that Guiffreda acted with reckless indifference beyond a reasonable doubt, so we reverse on that ground without deciding whether there is sufficient evidence that she was a major participant.  (See *People v. Keel* (2022) 84 Cal.App.5th 546, 557, fn. 2 (*Keel*) [declining to decide major participant issue and reversing denial of section 1172.6 petition based on insufficient evidence of reckless indifference].)

A. *Governing Law*

Effective January 1, 2019, Senate Bill No. 1437 significantly limited the scope of the felony-murder rule and eliminated liability for murder under the natural and probable consequences doctrine through two key provisions. (Stats. 2018, ch. 1015, § 1, subd. (f); see *People v. Strong* (2022) 13 Cal.5th 698, 707–708 (*Strong*).)  First, Senate Bill No. 1437 amended section 189 so that "[d]efendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life[.]' " (*Strong*, at p. 708, citing § 189, subd. (e)(3).)  Second, it amended section 188 to provide that, when the felony-murder rule does not apply, a principal in the crime of murder can only be convicted where she acted "with malice aforethought," and "[m]alice shall not be imputed to a person based solely on

9

his or her participation in a crime." (§ 188, subd. (a)(3); see *People v. Gentile* (2020) 10 Cal.5th 830, 842–843.)

Senate Bill No. 1437 also established a new procedure to allow defendants who could not have been convicted under the new law to petition the sentencing court to vacate their murder convictions and resentence them on any remaining counts. (See § 1172.6, subd. (a); *Strong, supra,* 13 Cal.5th at p. 708.) After receiving a petition containing the required information, "the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.'" (*Strong*, at p. 708, citing § 1172.6, subd. (c).) If the defendant makes a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold an evidentiary hearing to determine whether relief should be granted. (§ 1172.6, subds. (c), (d)(3).)

Effective January 1, 2022, Senate Bill No. 775 (2020–2021 Reg. Sess.) (Senate Bill No. 775) amended section 1172.6 to clarify certain aspects of the law, including that (1) the burden of proof at a resentencing hearing under this section is "on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder" under California law as amended by Senate Bill No. 1437 and (2) "[a] finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3); see also Stats. 2021, ch. 551, § 1, subd. (c).) Senate Bill No. 775 clarified that the trial court's role in a section 1172.6 proceeding is to act as an independent fact finder and determine, in the first instance, whether the petitioner committed murder under the law as amended by Senate Bill No. 1437. (*People v. Clements* (2022) 75 Cal.App.5th 276, 294, 297 (*Clements*); see also *People v. Garrison* (2021) 73 Cal.App.5th 735, 745,

10

fn. omitted [the trial court acts as "an independent fact finder, to determine beyond a reasonable doubt whether defendant is guilty of murder under a valid theory of murder"].)

Under the amended felony-murder rule, a defendant who was not the actual killer and did not act with the intent to kill can only be liable for murder if she was a major participant in the underlying felony and acted with reckless indifference to human life. (*Strong*, *supra*, 13 Cal.5th at p. 708, citing § 189, subd. (e)(3).) "[T]he standard under section 189, subdivision (e)(3) for holding . . . a defendant liable for felony murder is the same as the standard for finding a special circumstance under section 190.2(d), as the former provision expressly incorporates the latter." (*In re Taylor* (2019) 34 Cal.App.5th 543, 561.) Accordingly, death penalty cases interpreting section 190.2, subdivision (d), including *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), are controlling here.

In *Banks*, a defendant was convicted of first-degree murder with a felony-murder special circumstance based on his actions as the getaway driver for an armed robbery in which a codefendant shot and killed one of the robbery victims while escaping. (*Banks*, *supra*, 61 Cal.4th at pp. 794, 797.) The Supreme Court concluded that the defendant was "no more than a getaway driver, guilty . . . of 'felony murder *simpliciter*' [citations] but nothing greater," and that the evidence was insufficient to show he knew his own actions would involve a grave risk of death. (*Id.* at pp. 805, 807.)

In *Clark*, a defendant was convicted of first-degree murder with robbery-murder and burglary-murder special circumstances found true, based on his liability as an aider and abettor to an accomplice's fatal shooting of a victim during an attempt to rob an electronics store. (*Clark*, *supra*, 63

11

Cal.4th at p. 610.) The Supreme Court vacated those special circumstance findings based on insufficient evidence that the defendant was recklessly indifferent to human life after considering "the case-specific factors that this court and other state appellate courts have considered in upholding a determination of reckless indifference to human life in cases involving nonshooter aiders and abettors to commercial armed robbery felony murders." (*Id.* at pp. 618, 623–624.)

The holdings in those cases dictate that to determine whether a defendant acted with reckless indifference to human life, courts should look to whether a defendant " 'knowingly engag[ed] in criminal activities known to carry a grave risk of death.' " (*Banks*, *supra*, 61 Cal.4th at p. 801, internal quotations omitted.) "The defendant must be aware of and willingly involved in the violent manner in which a particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Ibid.*) Although "there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life," such as " 'the manufacture and planting of a live bomb,' " armed robbery is not among them. (*Clark*, *supra*, 63 Cal.4th at p. 615, quoting *Banks*, at p. 810, fn. 9.)

In *Clark*, *supra*, 63 Cal.4th at pages 618–622, the court enumerated a five-factor test to determine whether a defendant acted with reckless indifference to human life, clarifying that no one factor is necessary, nor is any sufficient by itself. The first factor is the defendant's knowledge of weapons used, her own use of weapons, and the number of weapons involved. (*Id.* at p. 618.) The court noted that "[t]he mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Ibid.*) The second factor is whether the

12

defendant was physically present at the crime scene and whether she had opportunities to restrain the crime or aid the victim(s). (*Id.* at p. 619.) A defendant's presence may be particularly significant where "the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force." (*Ibid.*)

The third factor is the duration of the felony; crimes of longer duration present greater risk of violence and therefore evince more reckless indifference. (*Clark*, *supra*, 63 Cal.4th at p. 620.) The fourth factor is the defendant's knowledge of his or her coparticipants' likelihood of killing. (*Id.* at p. 621.) A defendant who knows a coparticipant has previously used lethal force is more culpable than one unaware of that person's propensity for violence. (*Ibid.*) Finally, the fifth factor is whether the defendant made any efforts to minimize the risk of violence during the felony. (*Ibid.*) Such efforts may include planning the felony to occur at a time or location where bystanders are unlikely to be present or using unloaded firearms. (See *id.* at pp. 621–622.)

Both the "magnitude of the objective risk of lethal violence and a defendant's subjective awareness of that risk" are relevant to the reckless indifference inquiry. (*Clark*, *supra*, 63 Cal.4th at p. 623.) "Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to demonstrate reckless indifference to human life. Instead, "knowingly creating a 'grave risk of death' " is necessary to establish the requisite mindset. (*Banks*, *supra*, 61 Cal.4th at p. 808.) As relevant here, " 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*), quoting

13

*Banks*, at p. 808 [alteration in original].) "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and must then consciously disregard "the significant risk of death his or her actions create." (*Banks*, at p. 801.)

B. *Standard of Review*

We review the trial court's factual findings for substantial evidence. (*Clements*, *supra*, 75 Cal.App.5th at p. 298.) "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Ibid.*) We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

C. *Analysis*

Analyzing the totality of the circumstances and applying the relevant *Clark* factors to this case, we conclude that substantial evidence does not support the trial court's finding that Guiffreda acted with reckless

14

indifference to human life.[2]  First, Guiffreda did not use a weapon, nor is there any evidence that she knew a weapon of any kind would be used during the robbery.  (*Clark*, *supra*, 63 Cal.4th at p. 618.)  Although Guiffreda knowingly participated in the robbery, there is no evidence that she was part of any preconceived plan to beat M.B. with a fatal instrument, or that she knew of any such plan before entering M.B.'s room, or that she had advance knowledge or any reason to suspect that one of her accomplices would use a bat, flashlight, pipe, or other lethal weapon to beat the victim.  None of the witnesses saw Guiffreda's accomplices with any weapon before she entered the victim's room, and there was no direct or circumstantial evidence that she knew Oie would arm himself.  (See *In re Bennett* (2018) 26 Cal.App.5th 1002, 1025 ["There was also no evidence presented that [defendant] observed anything before the events leading up to the robbery that would have indicated his other codefendants were likely to engage in lethal violence."].)

Assuming that the People's theory at the preliminary hearing was correct, and that the weapon Oie used to beat M.B. was a flashlight he took from the parked truck, witness testimony shows that he likely obtained the flashlight just before entering the room, outside of Guiffreda's presence.  The

---

[2]     As noted, the trial court found beyond a reasonable doubt that Guiffreda acted with reckless indifference to human life, but also found insufficient evidence that Guiffreda acted with the malice aforethought required for direct aider and abettor liability for second degree murder. These findings are difficult for us to reconcile.  The "reckless indifference" standard actually "requires subjective awareness of a *higher* degree of risk than the 'conscious disregard for human life' required for conviction of second degree murder based on implied malice."  (*People v. Johnson* (2016) 243 Cal.App.4th 1247, 1285, italics added.)  On appeal, the People do not challenge the trial court's finding of insufficient evidence of malice or explain how these findings may be reconciled.  We need not resolve this apparent inconsistency, however, because we find insufficient evidence to support the trial court's finding of reckless indifference.

People point to no evidence that Guiffreda knew Oie would arm himself by stealing a flashlight from an apparently unlocked truck in the parking lot when she was already inside M.B.'s room. Even the trial court acknowledged, "[t]here is no direct evidence that she believed they had obtained a flashlight to use as a weapon." Accordingly, this factor weighs heavily in favor of finding Guiffreda did not act with reckless indifference.

Second, we consider whether Guiffreda was physically present at the crime scene and whether she had opportunities to restrain the crime or aid the victim. (*Clark*, *supra*, 63 Cal.4th at p. 619.) Here, as just noted, even though Guiffreda was present when the beating started, she was not present when Oie obtained the murder weapon. There is no substantial evidence that Guiffreda could have intervened to prevent the beating given that she was outnumbered by her codefendants, she was herself unarmed, she may not have known that Oie was armed with a weapon for any appreciable period of time before he began using it to bludgeon M.B., there was no sign of a struggle (thus suggesting that M.B. was disabled quickly), and as discussed *post*, the evidence shows the assault began and ended within a span of minutes. (See *Scoggins*, *supra*, 9 Cal.5th at p. 679 [defendant "lacked control over [his accomplices'] actions once they arrived on the crime scene, especially given how quickly the shooting occurred[]"]; *Keel*, *supra*, 84 Cal.App.5th at p. 560 [defendant who was present and armed with revolver during robbery nevertheless did not have a "meaningful opportunity to restrain" his armed accomplice who committed the shooting where robbery was spontaneous and decision to shoot made quickly].)

Although Guiffreda could have tried to aid M.B. after the beating by calling 911, the Supreme Court in *Scoggins* noted "that when different inferences may be drawn from the circumstances, the defendant's actions

16

after the shooting may not be very probative of [her] mental state." (*Scoggins*, *supra*, 9 Cal.5th at p. 679.) Here, the evidence shows that Guiffreda walked quickly from the room after the assault without waiting for her accomplices, which could suggest "either that [Guiffreda] rejected [her] accomplice's actions" in committing the lethal assault "or that [s]he wanted to flee the scene as quickly as possible to avoid arrest. [Citation.]" (*Ibid.*) Guiffreda may also have chosen not to call 911 out of loyalty to her husband or fear that it would result in them being apprehended for the crime. As in *Clark*, the ambiguity in Guiffreda's actions after the beating "make[s] it difficult to infer [her] frame of mind concerning" M.B.'s death. (*Clark*, *supra*, 63 Cal.4th at p. 620.) In the absence of any other evidence that Guiffreda knew a weapon would be used to commit the robbery, her actions immediately after the beating do not establish that she was " 'aware of and willingly involved in the violent manner' " in which the crime was committed. (*Scoggins*, at p. 677.) Overall, this factor does not weigh substantially in favor of a finding of reckless indifference to human life.

Third, courts have considered "whether a murder came at the end of a prolonged period of restraint of the victims by defendant" in analyzing the defendant's culpability. (*Clark*, *supra*, 63 Cal.4th at p. 620.) Because extended restraint of victims provides " 'a greater window of opportunity for violence' [citation], possibly culminating in murder," it can indicate that the defendant exhibited reckless indifference to human life. (*Ibid.*) Here, the evidence indicates that the duration of the entire interaction between the defendants and the victim was less than ten minutes. The motel manager testified that the defendants were evicted from their room at 2:15 p.m., and he observed the victim bloodied and alone in the room at 2:35 p.m. Other witnesses testified that ten minutes elapsed between when they saw the

17

defendants leave the victim's room and when the witnesses and the manager discovered the victim.

Based on this evidence, in the approximately ten minutes between 2:15 p.m. and 2:25 p.m., Guiffreda spoke with M.B. outside before entering his room with him; Oie and Peace brought their belongings to the truck and Oie acquired the murder weapon; the two men entered the room and assaulted M.B.; the defendants went through the victim's belongings and took his cash; and then the defendants exited the room. The evidence shows the entire sequence of events occurred rapidly within a short timeframe, and that the defendants were in the room with the victim for mere minutes. Moreover, the robbery appears to have been a purely spontaneous crime of opportunity committed simply because M.B. was walking around the motel with a bank envelope sticking out of his back pocket. This factor thus weighs against finding that Guiffreda exhibited reckless indifference to human life. (See *Keel*, *supra*, 84 Cal.App.5th at pp. 560–561 [third *Clark* factor "significantly reduce[d]" defendant's culpability where robbery was "unexpected and unplanned" and "events unfurled in rapid succession once the encounter began"].)

Fourth, there is no substantial evidence that Guiffreda knew Oie was likely to use lethal force. (*Clark*, *supra*, 63 Cal.4th at p. 621.) As already noted, there is no evidence that Guiffreda knew Oie would use a weapon during the assault. There is also no evidence that Guiffreda knew Oie had any violent past convictions or had committed violent crimes. One witness did testify that he saw Oie being physically abusive to Guiffreda. However, even if Guiffreda knew that Oie was "prone to some degree of violence, and even though the planned assault of [M.B.] necessarily contemplated the use of violence, the evidence does not support a finding that [Guiffreda] acted

18

with reckless indifference to human life" because no evidence shows she knew he was likely to use *lethal force*. (See *Scoggins*, *supra*, 9 Cal.5th at p. 682.) "Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient"; reckless indifference to human life requires "knowingly creating a '*grave risk of death*.'" (*Banks*, *supra*, 61 Cal.4th at p. 808; see also *In re Ramirez* (2019) 32 Cal.App.5th 384, 406 [concluding defendant did not act with reckless indifference to human life because there was no evidence "that he anticipated the potential for loss of human life beyond that usually accompanying an armed robbery[]"].)

"The degree of risk to human life is crucial to the analysis." (*Scoggins*, *supra*, 9 Cal.5th at p. 682.) The context here is a far cry from situations in other cases where, for example, defendants had advance knowledge that their cohorts were convicted murderers (see, e.g., *Tison v. Ariz.* (1987) 481 U.S. 137, 151), or knew from prior robberies that their cohorts would be armed (see, e.g., *People v. Proby* (1998) 60 Cal.App.4th 922, 929). As was the case in *Scoggins*, the record here does not show that Guiffreda knew her accomplices were likely to deviate from the plan and use weapons of any kind, let alone lethal force. (See *Scoggins*, at p. 682.)

Fifth, a defendant's efforts to minimize the risk of violence in the commission of a felony are relevant to assessing reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at pp. 621–622.) In this case, while it is true that the defendants' plan included violence, "the need to minimize the risk of violence when planning an unarmed beating is less pressing than the need to minimize the risk of violence when planning an armed robbery." (*Scoggins*, *supra*, 9 Cal.5th at p. 683.) The record includes no indication that Guiffreda knew the beating would involve the use of weapons. "This fact is, by itself, a significant step towards minimizing the likelihood that the plan

19

would result in a 'grave risk of death.' " (*Ibid.*) Planning an unarmed robbery, in certain scenarios, could potentially show reckless indifference to human life. But under the circumstances here, neither this factor nor any of the other *Clark* factors weighs significantly in favor of finding that Guiffreda acted with reckless indifference to human life. Considering all of the evidence in its totality, we conclude that it is insufficient to support such a finding beyond a reasonable doubt.[3]

We are not persuaded by the trial court's reasoning that Guiffreda acted with reckless indifference to human life because the scenario she and her accomplices concocted of an "outraged husband" discovering someone raping his wife "carrie[d] with it an inherent extreme likelihood of an intent to administer a severe beating . . . ." Even assuming there was a plan to stage a rape, Guiffreda's accomplices were both in on the plan; Guiffreda had no reason to believe that her husband would use the same degree of force as if he were genuinely outraged at discovering someone actually raping his wife. Moreover, according to the evidence, the rape story was not invented to justify the use of extreme force against M.B.; it was invented to have a cover story to tell the police if necessary. In fact, it is questionable whether this plan was even carried out because M.B. was fully clothed when he was discovered after the beating.

We are also not persuaded by the trial court's finding that Guiffreda's statements to Mancillas reflected "a consciousness of guilt for homicide." By that time, Guiffreda knew she had willingly participated in a robbery that

---

3    Both of the cases the trial court relied on in finding that Guiffreda acted with reckless indifference (*People v. Smith* (2005) 135 Cal.App.4th 914 and *People v. Lopez* (2011) 198 Cal.App.4th 1106, disapproved in *Banks*, *supra*, 61 Cal.4th at p. 809, fn. 8), are of limited value because they were decided before *Banks* and *Clark*.

resulted in a fatal beating committed by her accomplices. Though her statements may have reflected a consciousness of guilt for the killing after the fact, nothing she said to Mancillas suggested that she participated in the robbery knowing that the violent manner in which it would be committed carried a grave risk of death. (*Banks*, *supra*, 61 Cal.4th at p. 801.) In fact, at least one of her statements to Mancillas suggested that the original plan was not "to hit too much."

The People rely on *In re Harper* (2022) 76 Cal.App.5th 450 (*Harper*), *People v. Douglas* (2020) 56 Cal.App.5th 1 (*Douglas*), *People v. Mora* (1995) 39 Cal.App.4th 607 (*Mora*), and *People v. Bustos* (1994) 23 Cal.App.4th 1747 (*Bustos*), to argue that Guiffreda's inaction during the robbery, and her actions afterwards, displayed reckless indifference to human life. However, each of those cases is distinguishable.

In *Harper*, a defendant went with two cohorts to rob a store, knowing that one of them was armed with a shotgun. (*Harper*, *supra*, 76 Cal.App.5th at pp. 456–457.) The defendant acted as a lookout while his codefendants took the store's owner to the bathroom. (*Id.* at p. 454.) When one codefendant emerged to ask the defendant where the knives were, the defendant directed her to the correct aisle, even though he wondered at that time if she was getting a knife to stab the victim. (*Id.* at pp. 454–455.) When the defendant heard pounding and yelling coming from the bathroom, he did nothing, and even joked about the robbery afterwards. (*Id.* at pp. 461, 462–463.) Unlike in this case, the *Harper* defendant knew or suspected that his accomplices intended to use lethal force, facilitated the use of that force by directing his codefendant to the knives, and declined opportunities to restrain his accomplices. While Guiffreda did take the victim's money and fled the scene afterwards, there is no evidence that she acted with a level of

callousness similar to that of the defendant in *Harper*, who joked after the murder that he and his cohorts could do laundry with all the quarters he took from the cash register. (See *id.* at p. 455.)

In *Douglas*, the Court of Appeal concluded that the defendant acted with reckless indifference to human life because he planned the armed robbery of a video store, supplied a loaded gun to his cohort, and was in charge while the crime was carried out. (*Douglas*, *supra*, 56 Cal.App.5th at pp. 3–4.) After his codefendant shot the store clerk, the defendant not only emptied the cash register, but also "emptied [the clerk's] pockets while [he] lay on the ground with blood pooling around his head." (*Id.* at p. 4.) Two days later, he and the shooter committed another armed robbery. (*Ibid.*) Here, Guiffreda did not plan an armed robbery, nor did she supply any weapon, take charge of the assault, or commit additional robberies afterwards. And again, there is no evidence she acted with the same degree of indifference or callousness as the defendant in *Douglas*.

In *Mora*, a case which predates *Banks* and *Clark*, the defendant went with his codefendant—who he knew was armed—to a drug dealer's home at night to rob him. (*Mora*, *supra*, 39 Cal.App.4th at p. 617.) The defendant knew the drug dealer, so he knocked on the door and was let inside. (*Id.* at p. 611.) While the defendant smoked marijuana with the dealer and another person in the house, his codefendant entered with a high-powered rifle and fatally shot the drug dealer. (*Ibid.*) The Court of Appeal concluded that the *Mora* defendant acted with reckless indifference to human life because he "admitted planning to go to a drug dealer's home at night to rob him by having [the codefendant] enter with a rifle which fired three-inch bullets. Defendant had to be aware of the risk of resistance to such an armed invasion of the home and the extreme likelihood death could result." (*Id.* at p. 617.)

In this case, Guiffreda did not plan a home invasion, and there is no evidence that she knew Oie would be armed at all.

Finally, *Bustos* is also distinguishable. In *Bustos*, three young codefendants robbed a woman and stabbed her to death in a women's restroom on a beach in Malibu. (*Bustos, supra*, 23 Cal.App.4th at p. 1751.) The Court of Appeal concluded one of the defendants acted with reckless indifference to human life, even though he did not personally stab the victim, because he admitted to planning the robbery with his cohorts and admitted to knowing about the knife his codefendant used in the murder. (*Id.* at p. 1754.) The defendant also admitted to hitting the victim himself, and it was reasonable to infer that the defendant engaged in a struggle with the resisting victim. (*Ibid.*) Again, the *Bustos* defendant stands in stark contrast to Guiffreda because there is no evidence that she herself assaulted M.B., that she engaged in a struggle with him, or that she knew about any planned use of weapons.

As this court recently stressed in finding insufficient evidence of deliberate indifference on the part of another participant in an armed robbery, "[w]e are mindful that the substantial evidence standard of review is a deferential one, which often results in an affirmance of the judgment or order rendered by the trial court." (*Keel, supra*, 84 Cal.App.4th at p. 557.) In this case, however, the totality of the evidence shows that Guiffreda knowingly participated in a plan to commit an *unarmed* assault and robbery, and one of her accomplices deviated from that plan by arming himself after the plan was in motion. The evidence does not establish that Guiffreda knew her cohorts were likely to use lethal force. On the facts here, there is insufficient evidence that Guiffreda "knowingly creat[ed] a 'grave risk of

death'[,]" and therefore, her petition for resentencing must be granted. (*Banks*, *supra*, 61 Cal.4th at p. 808.)

## DISPOSITION

The order denying Guiffreda's section 1172.6 petition is reversed and remanded with directions to grant the petition, vacate the murder conviction, and conduct further proceedings on the prosecution's request (made in its formal return to the petition) for resentencing on the underlying robbery under section 1172.6, subdivision (d). We express no view on the validity or propriety of the prosecution's request for resentencing on the underlying robbery. Following the conclusion of proceedings on remand, the trial court shall amend the abstract of judgment as necessary and forward copies of the amended abstract to the appropriate law enforcement and custodial officials.

BUCHANAN, J.

WE CONCUR:

HUFFMAN, Acting P.J.

DO, J.

24